The CONLON GROUP, INC., Respondent,

v.

The CITY OF ST. LOUIS, Appellant.

Nos. 73789, 73890.

Missouri Court of Appeals,
Eastern District,
Division Five.

Sept. 1, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 26, 1998.

Application for Transfer Denied
Dec. 22, 1998.

Eric Kendall Banks, Edward J. Hanlon, Steven R. Wild, St. Louis, for appellant.

Daniel P. Finney, Jr., Michael A. Gross, Cynthia A. Sciuto, St. Louis, for respondent.

ROBERT G. DOWD, Jr., Judge.

The Conlon Group, Inc., (Conlon Group) brought an inverse condemnation action against the City of St. Louis (City) after the Heritage and Urban Design Commission (HUDC) denied its request to demolish two buildings in the City of St. Louis. The circuit court found HUDC's denial of the demolition permit effectively deprived Conlon Group of any economically viable use of its property and awarded Conlon Group $4,259,387. The City appeals claiming: 1) the trial court was precluded from determining the issue of economic viability by the doctrine of collateral estoppel; 2) the trial court erred in rendering judgment for Conlon Group on the inverse condemnation claim because Conlon Group had entered into a Redevelopment Agreement and under the terms of the agreement had no right to demolish the buildings; and 3) the trial court erred in the amount of damages awarded to Conlon Group. We reverse.

In May of 1993, Conlon Group purchased real property in the City of St. Louis commonly known as the Syndicate Trust and Century Buildings from the Federal Deposit Insurance Corporation (FDIC) for $625,000. The Century Building is approximately 100 years old, and the Syndicate Trust Building is approximately 70 years old. Although they were built separately, the two buildings were essentially connected without an expansion joint and operated as one. Together, the buildings comprise an entire city block in downtown St. Louis. The City has not designated the buildings as a landmark or a historic site. Conlon Group financed the purchase of the buildings by borrowing approximately $500,000 from Southwest Bank. Conlon Group paid off the loan in approximately fourteen months.

Within a few months of purchasing the buildings, Conlon Group decided to renovate. The plan called for the conversion of the lower floors to indoor parking and the upper floors to office space for lease. Conlon Group approached the Land Clearance for Redevelopment Authority of the City of St. Louis (LCRA) and submitted the proposal. The LCRA approved the redevelopment plan and produced a blighting plan. The Board of Aldermen approved and incorporated the plans into Ordinance 63073 on December 22, 1993. On March 16, 1994, Conlon Group and LCRA entered into a written Redevelopment Agreement. The Redevelopment Agreement between Conlon Group and LCRA incorporated Ordinance 63073.

Section Fifteen of Ordinance 63073 provides in pertinent part that, "Where a proposed modification will substantially change the Plan, the modification must be approved by the St. Louis Board of Aldermen in the same manner as the Plan was first ap-

proved." Section Fourteen of Ordinance 63073 allowed Conlon Group to seek a ten-year tax abatement. Also, the LCRA agreed in Paragraph 7 of the Redevelopment Agreement to cooperate with Conlon Group and use its best efforts to assist Conlon Group in getting the maximum benefits of the tax abatement. Conlon Group further agreed to use the property pursuant to the provisions of the Plan, and be bound by the conditions and procedures set forth in the Redevelopment Agreement and in the Ordinance.

After both parties signed the Redevelopment Agreement, Conlon Group commenced with its plan to convert floors two through five from office space into parking. As a contractor performed interior demolition work, a part of the concrete floor collapsed under the weight of the equipment used to perform the demolition work. Conlon Group suspended work on the project to perform further research into the condition of the buildings. After obtaining some preliminary engineering analyses, the engineers discovered that the concrete strength and the capacity of the floor slabs in the buildings could not support the load of a parking garage. The structural defects necessitated a "gut" renovation. After considering the additional costs to remedy the structural deficiencies, which were estimated in the millions, Conlon Group decided to abort the original plan.

In the Spring of 1995, Conlon Group approached the St. Louis Development Corporation (SLDC) and LCRA to seek an amendment of its development plan and Redevelopment Agreement. Conlon Croup proposed to demolish the existing buildings and erect a new parking garage with retail space on the first floor. The only work that Conlon Group could immediately finance was the demolition and a surface lot. Conlon Group proposed an interim surface parking lot as a means of producing revenue. Conlon Group conceded that demolition of the Syndicate Trust and Century Buildings would constitute a substantial modification of the Redevelopment Agreement which had to be approved by the Board of Aldermen. Conlon Group obtained SLDC's recommendation and LCRA approval of the proposed amendment, and Board Bill 92 was introduced. The amendment was never approved by the Board of Aldermen.

Conlon Group then applied for a demolition permit application with the City. Under City Ordinance 61366, all applications must be approved by HUDC. Following a hearing, HUDC's Commissioner denied the application. Conlon Group then administratively appealed the denial to HUDC. The HUDC issued findings of fact and conclusions of law and again denied the permit. Conlon Group appealed the HUDC decision to the Circuit Court of Cole County. The circuit court reversed the HUDC decision denying the permit. The City then appealed the circuit court decision to the Western District Court of Appeals. The Western District found the record insufficient and remanded the case to HUDC to make proper findings of fact and conclusions of law. *Conlon Group, Inc. v. City of St. Louis*, 944 S.W.2d 954, 958–59 (Mo.App. W.D.1997). On remand, HUDC issued findings of fact and conclusions of law and again denied the demolition permit. Conlon Group did not appeal the HUDC's second decision. Instead, Conlon Group brought an inverse condemnation action based on Art. I, Sec. 26 of the Missouri Constitution.

We choose to address the City's second point on appeal because it is dispositive of the other issues. In its second point on appeal, the City asserts that the trial court erred in rendering judgment for Conlon Group on its claim of inverse condemnation. The City argues Conlon Group voluntarily entered into a Redevelopment Agreement with LCRA under which it agreed to rehabilitate the buildings and abide by the terms and conditions of the redevelopment ordinance which prohibited demolition without approval by the City of St. Louis Board of Aldermen. Conlon Group argues, on the other hand, that the Redevelopment Agreement was not enforceable.

The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976).

■ A redevelopment agreement is no different from any other contract, and it is measured by the same tests and subject to the same rights and liabilities. *Schweig v. Maryland Plaza Redevelopment Corporation*, 676 S.W.2d 249, 257 (Mo.App. E.D. 1984). Redevelopment agreements, like other bilateral agreements, are presumed valid and enforceable. *Id.* A redevelopment agreement constitutes a binding contract, with mutual obligations on the parties. *Id.*

■ Conlon Group voluntarily entered into the Redevelopment Agreement. Conlon Group received benefits in the form of a tax abatement and exclusive development rights, in exchange for its agreement to rehabilitate the buildings. At trial, the president of Conlon Group testified that one of the main reasons for entering into the agreement was to take advantage of the tax abatement. Conlon Group could have redeveloped the property without aid from the City and LCRA, but instead chose to pursue the tax abatement route. Since Conlon Group voluntarily entered into the agreement in order to obtain the benefits of such an agreement, it is bound by the terms of the agreement.

■ The City introduced the Redevelopment Agreement at trial and Conlon Group conceded that the modification was a substantial deviation from the original plan and such an amendment required the approval of the Board of Aldermen. The Board of Aldermen gave no such approval. However, Conlon Group argues that the approval by SLDC and LCRA was in effect approval from the City, since SLDC and LCRA are part of the City's municipal structure. We disagree.

A redevelopment authority requires local governing approval for all substantive exercise of its statutory powers. Section 99.330(1), RSMo 1998; *Land Clearance for Redevelopment Authority of Kansas City, Mo. v. Waris*, 790 S.W.2d 454, 455 (Mo.1990). Section 99.330 provides in pertinent part:

> There is hereby created in each community (as herein defined) a public body corporate and politic, to be known as the "Land Clearance for Redevelopment Authority" of the community; provided, however:
>
> (1) That such authority shall not transact any business or exercise its powers hereunder until or unless the governing body shall approve (by resolution or ordinance as herein provided) the exercise in such community of the powers, functions and duties of an authority under this law.

A redevelopment authority is a subordinate body administering the details of a city's or county's redevelopment policy as expressly approved by the governing body. *Land Clearance for Redevelopment Authority for Kansas City, Mo. v. Waris*, 790 S.W.2d at 455. Conlon Group's negotiations with SLDC and LCRA, no matter how extensive, still required the approval of the Board of Aldermen. Moreover, the fact remains that the plain language of the Redevelopment Agreement required the approval of the Board of Aldermen for modifications that would substantially change the original plan. There was no language in the Redevelopment Agreement that authorized SLDC or LCRA to approve such a modification. Therefore, without approval from the Board of Aldermen, the Redevelopment Agreement prohibited demolition.

■ In response, Conlon Group argues that the Redevelopment Agreement was unenforceable because the development plan was no longer feasible due to "commercial frustration." "Commercial frustration" exists when an event unforeseen by the parties happens that is not caused by or under the control of either party and destroys or nearly destroys the value of the performance or the purpose of the contract. *Shop 'N Save Warehouse Foods, Inc. v. Soffer*, 918 S.W.2d 851, 863 (Mo.App. E.D.1996). The doctrine of commercial frustration is meant to have limited application so as to preserve the certainty of the contracts. *Id.*

■ The doctrine of commercial frustration is inapplicable here. First, the structural defects were foreseeable in the 100–year–old building. The trial court found that Conlon Group could not have foreseen the nature and extent of the structural problems prior to the purchase by looking at the building plans and the FDIC information packet.

However, Conlon Group could have discovered such defects by investigating the structural soundness of the buildings prior to entering into the Redevelopment Agreement. Conlon Group purchased the buildings in "as is" condition, without performing any type of engineering, environmental, or marketing analysis. It then failed to conduct any extensive investigation of the structural soundness of the buildings before entering into the Redevelopment Agreement. Yet, Conlon Group's own structural engineer testified at trial that one of the first steps in the development process of a 100–year–old building should have been to conduct extensive tests and core tests to make sure the concrete slabs were suitable for the project.

Second, the purpose of the Redevelopment Agreement has not been destroyed. Although the expected costs of the redevelopment project have increased considerably, there was testimony that the original plan remains feasible. We find that the doctrine of commercial frustration is inapplicable, leaving a valid and enforceable agreement.

Since there was a valid and enforceable agreement between Conlon Group and LCRA, we find that the trial court erroneously applied the law of inverse condemnation in the present case. Mo. Const. Art. I, Sec. 26 provides that: "private property shall not be taken or damaged for public use without just compensation." Under this constitutional provision, to recover for a claim of inverse condemnation, a plaintiff must show the government appropriated "some valuable property right which the landowner has acquired by the legal and proper use of [its] land." *Ressel v. Scott County,* 927 S.W.2d 518, 520 (Mo.App. E.D.1996). When Conlon Group entered into the Redevelopment Agreement, it voluntarily gave up full control of its property rights. *See State ex rel. Washington Ave. Redevelopment Corp. v. City of St. Louis,* 906 S.W.2d 808, 811 (Mo. App. E.D.1995). Conlon Group agreed to abide by the terms of the Redevelopment Agreement, which limited its control of its property rights. These limits include a requirement that the Board of Aldermen approve all substantial modifications. As such, the rights and duties of the parties are governed by contract law, not by the takings clause of the Missouri Constitution. Therefore, we reverse the trial court's judgment.

Because we hold that the language of the Redevelopment Agreement controls, we need not consider the other points on appeal. Our holding also renders respondent's cross-appeal, concerning prejudgment interest, moot.

Judgment reversed.

CRANDALL and AHRENS, JJ., concur.